Judgment rendered August 10, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,699-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MATTHEW AND TERRI
WILSON

Plaintiffs-Appellants

versus

LACY BROWN

Defendant-Appellee

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Union, Louisiana
Trial Court No. 47,835

Honorable Thomas Wynn Rogers, Judge

* * * * *

KNIGHT LAW FIRM
By: Robert Thomas Knight

Counsel for Appellants

THE LAW OFFICE OF ALLEN
COOPER, LLC
By: Joseph Christopher Miciotto

Counsel for Appellee

* * * * *

Before STONE, COX, and ROBINSON, JJ.

**ROBINSON, J.**

Paternal grandparents appeal a judgment dissolving a protective order and ordering shared custody with the goal of reunifying their grandson with his mother.

We affirm the judgment.

**FACTS**

B.B., whose birthdate is January 30, 2013, was born during the marriage of Lacy Brown ("Lacy") and Joshua Brown ("Joshua"). On July 27, 2016, Joshua filed for divorce. Joshua and Lacy agreed to shared custody of B.B., with each having alternating weeks with their son. Joshua and B.B. lived at the home of Joshua's mother, Terri Wilson ("Terri"), and stepfather, Matthew Wilson, during the weeks that Joshua had custody of B.B.

Lacy began a relationship with Philip Casey Brown ("Casey") while still married to Joshua. On June 16, 2017, Joshua was killed during an accident while driving a tanker truck for work. The funeral was held five days later. A commotion occurred following the funeral when Lacy would not allow B.B. to leave with the Wilsons, which led to a deputy from the Union Parish Sheriff's Office ("UPSO") being called to the scene.

On July 14, 2017, the Wilsons filed a petition for visitation against Lacy. They alleged that Lacy had refused to allow them any visitation with B.B. since Joshua's funeral. They sought visitation rights on alternating weeks.

By a consent judgment signed on August 24, 2017, the parties agreed that the Wilsons would have visitation rights on alternating weekends,

certain holidays and special occasions, and for two seven-week periods during the summer.

Deputies from the UPSO responded to a complaint from Terri concerning B.B. on November 3, 2017. According to the police report, Terri told the deputies that B.B. complained that his lip hurt when she picked him up for visitation. Terri stated that B.B. told her that when his mother spanked him, he fell and hit his mouth. A small cut was visible on his mouth. B.B. told the deputies that his mother spanked him hard and he fell. Terri also told the deputies that B.B. had a small bruise on his buttocks. Terri asked the deputies not to contact Lacy concerning this because she only wanted a report of the incident.

In December of 2017, Terri photographed bruises on B.B.'s buttocks. Terri filed a police report against Casey on December 29, 2017, and he was subsequently arrested and charged with domestic abuse battery. A protective order against Casey on B.B.'s behalf was entered on January 3, 2018. A protective order against Lacy was entered on January 22, 2018.[1]

On January 10, 2018, the Wilsons filed a motion to modify custody. B.B. had been placed in their care pursuant to the protective order. The Wilsons, who sought sole custody of B.B., contended that a change in custody was necessary because of Casey's arrest and because Lacy continued to reside with Casey. The Wilsons alleged that substantial danger existed if the current order between the parties were not modified to award sole care of B.B. to them. They further alleged that B.B. had been

---

[1] The protective order against Casey was attached to the motion to modify custody. The protective order against Lacy was referred to at trial.

2

emotionally and psychologically damaged by the abuse he suffered at the hands of Lacy and Casey.

A son, T.B., was born to Lacy and Casey in April of 2018. Another son, C.B., was born to them in October of 2020. A daughter, S.B., was born to them in the fall of 2021. Although engaged, Lacy and Casey were not married at the time judgment was rendered in this matter.

In April of 2018, the Wilsons began taking B.B. to Amanda Power, a licensed professional counselor, in West Monroe, Louisiana. Supervised visits between Lacy and B.B. were initially done through Ryan Forbes in Ruston, Louisiana. An undated letter from Forbes to Lacy's counsel states that Lacy and B.B. attended supervised sessions in his office from May 16, 2018, until February 6, 2019. According to the letter, they met for an hour every Wednesday with few exceptions.

On February 20, 2019, Terri's counsel wrote to Lacy's counsel that B.B. would not be attending visitation with Forbes that evening and that Terri had arranged for visitation to be held at the Wellspring Center in Monroe. The letter explained that visitation would no longer be held with Forbes because he would not provide the Wilsons with any information regarding the visits.

On January 8, 2020, Casey was found not guilty of the domestic abuse battery charge.

The first visit at Wellspring was done on May 21, 2021. B.B. chose to prematurely end that visit. A visit scheduled for June 11 was cancelled because B.B. was ill. B.B. chose to leave a June 25 visit early. B.B. refused to attend visits at Wellspring on July 16 and July 30, and no visits were

scheduled after the later date. Lacy was left to communicate with B.B. through a weekly phone call.

*Trial*

Trial was held in this matter on October 6, 2021. Trial had been originally set for April 9, 2018, but was continued numerous times because of outstanding discovery on the part of Lacy. We note that Casey's criminal trial was not held until the beginning of 2020.

Britni Sims supervises visitation at the Wellspring Center. She testified concerning the visits that were cancelled or ended prematurely. According to Sims, B.B. never went into any detail concerning his refusal to participate in visits with his mother, although one time B.B. said he did not want to see his mother because he did not want to have to go back to her house. Wellspring personnel reassured him that would not happen while he was at Wellspring.

Amanda Power ("Power") testified as an expert licensed professional counselor. She first saw B.B. on April 9, 2018, when he was having some emotional problems and behavioral problems related to trauma. Power diagnosed B.B. as suffering from confirmed physical abuse, child neglect and abandonment, and disruption of family by separation and divorce.

Power recalled that when she first saw B.B., he expressed fear and concern about leaving the Wilsons' home, and he mostly dwelt on his fear of Casey. He told Power that he had been yelled at, ridiculed, and physically harmed by them.

Power confirmed B.B. was a victim of abuse based on her viewing of the police reports and photos. She asserted that B.B. claimed Lacy and

4

Casey abused him, and that it was a daily ongoing thing that one time escalated beyond the normal abuse. He also described being limited to specific parts of the home. He was also left alone in the home with his younger brother T.B. Nothing indicated to Power that B.B. had been coached to say certain things.

Power testified that B.B. has a great support structure with the Wilsons. He is involved in baseball and karate. He no longer needs to be on medication to control his behavior. Power added that the Wilsons have followed every recommendation that she had made to lessen B.B.'s level of trauma. The Wilsons do not speak ill of Lacy, and they recognize that Lacy is his mother and he needs to have an unconditional positive image of her. According to Power, B.B. believes that his mother chose Casey over him because she continued her relationship with the man who abused him.

Power also testified that B.B. has no relationship with Lacy and does not feel safe with her because he associates her with Casey. He began having nightmares again when visitation started, and is afraid that building a relationship with her puts him at risk of having to live with her and Casey. He became even more anxious because of his weekly phone call from Lacy and would create excuses not to take her call.

It was Power's opinion that B.B. would be best served remaining where he was unless significant changes were made by Lacy. Power thought B.B. needed stability and to stay at his current school. She believed that B.B. would suffer substantial emotional harm if he were placed back in a home with Casey and Lacy. She also believed that he would run away from home in order to return to the Wilsons. Power even thought that B.B. would

exhibit symptoms of regression if he were ordered to visit with his mother and attempt to rekindle their relationship.

Despite Casey's acquittal, Power would be very fearful of B.B.'s reunification with Lacy if Casey were present in the home. Power also felt that B.B. would face repercussions from Casey for all that had happened.

Power considered Lacy to be unmotivated regarding reunification with B.B. She thought Lacy's relationship with Casey took priority over her relationship with B.B. In fact, B.B. told Power that he does not want to see Lacy if she picked Casey over him.

Power never met with Lacy or Casey during her treatment of B.B. She testified that the information in her reports came from court records, police reports, intake forms completed by the Wilsons, what B.B. told her, and what she gathered from collateral contacts like teachers, coaches, and other family members. When asked if she was aware that Casey had been found not guilty, Power answered that someone had abused B.B. based on the photographs that she saw.

Lisa Tipton ("Lisa") is Lacy's mother. She and Lacy have been estranged for four years, although she did not know the reason for the estrangement. Lacy, who was working at a nursing home, began living with her aunt after separating from Joshua. According to Lisa, Lacy went on one date with Casey and never returned home.

Lisa recalled an incident when, after she went to Lacy's home to give some mail to her, she was told by Casey's father that she would be arrested if she returned. She also received a text message from Lacy that she did not want her parents around. Lisa and her husband are able to see B.B. on a

regular basis through the Wilsons, but they do not have a relationship with Lacy's other children.

Lisa testified that she asked Lacy about the bruises shown in the photos, which to her looked like belt marks. Terri showed her the photos following Casey's arrest. She recalled that Lacy told her that B.B. had fallen out of a truck, but she did not believe Lacy's explanation. Lisa never personally witnessed Casey or Lacy abuse B.B., and her knowledge of the alleged abuse came from Terri. Lisa testified that Terri told her that B.B. had said Casey whipped him with a belt.

Lisa testified that B.B. is afraid of Casey. He also told her that his mother is mean to him, and that Lacy locked him outside one time after he repeatedly asked for permission to play outside. According to Lisa, B.B. was allowed to play indoors only in his bedroom, and the remainder of the house was off limits to him.

In Lisa's opinion, B.B. would not be safe with Lacy and Casey. She believed that B.B. is happy living with the Wilsons and is better off with them than with his mother. Lisa stated that B.B. had told her that he would run away if he were returned to his mother.

Richard Tipton ("Richard") is Lacy's father. He testified that Lacy stopped communicating with her parents after he told her to ease up on B.B. Richard also testified that B.B. had told him that Lacy would not let him back inside on a hot day after he had earlier persisted in asking for her permission to play outside on a trampoline. In Richard's opinion, Lacy did not take good care of B.B. He thought B.B. needed to be with the Wilsons, as he was doing well and was happy with the Wilsons. Richard added that

his grandson threatened to run away if he were returned to his mother's home.

Lacy Brown lives with Casey Brown and their three children in a trailer located in Bernice, Louisiana that is owned by Casey. The trailer has three bedrooms and two bathrooms. Lacy is not employed. Lacy was living with her aunt at the time she met Casey. She testified that she went back and forth between his house and her aunt's house when they started dating.

At the time of trial, Lacy had not seen B.B. for two years. Lacy testified that she had called Wellspring about the interruption in visitation and was told B.B. still did not want to see her.

Lacy received social security benefits on B.B.'s behalf until 2018. The Wilsons now receive those benefits. She continues to receive workers' compensation benefits on his behalf. She claimed that the benefits go into an account and are never touched. Although she has received over $90,000 on his behalf, she has not given any money to the Wilsons to care for B.B.

Lacy disagreed that B.B. is scared of her or of Casey. She also denied that either she or Casey mentally or physically abused B.B. She had no idea why Power would say that her son is terrified of her and especially of Casey. She recalled that B.B. was always happy when he was at her home. Lacy denied that Casey showed favoritism to his biological son over B.B. She thought he treated B.B. like his own son. She recalled that B.B. would become excited every day when Casey would get home from work and they would play together. She denied locking B.B. out of the house.

When Lacy was shown at trial a set of three photos of bruises on B.B.'s buttocks, she denied that the bruises were caused by a belt. She also

8

denied that B.B. left her home with the bruises shown on another photo of his buttocks. When presented with a photo of marks on B.B.'s lips, she denied that he had bruising on his lips when he left her care. She also denied that he hurt his mouth when she spanked him and he fell, which was recorded in the police report. She explained that when she went to paddle him for standing in his chair, he slipped and hurt his lip, and the edge of the paddle hit the top of his buttocks and bruised him.

Lacy testified that B.B. received bruises when he fell out of their truck and hit his buttocks on the truck's bar step. They were getting ready to go to the home of Casey's mother at the time and she saw the bruise when she checked on him.

Lacy acknowledged that Casey had spanked B.B. three times in order to discipline him. On one of those occasions, Casey paddled B.B. with a wooden spoon after he saw B.B. trying to hurt one of the cats. That only left red marks which went away.

Lacy recalled that after the first protective order was issued, Casey went to stay with his sister in order for her to get B.B. back since Casey was no longer in the home. However, they returned to living together once she received her own protective order.

Lacy thought the last visitation supervised by Forbes was normal. She recalled that B.B. seemed happy and they played as they typically did. However, she thought visitation was very awkward at first when it resumed at Wellspring. Although B.B. seemed nervous to her, he did not appear to be afraid of her or give any indication that he did not want to see her anymore. Lacy reflected that it was hard to have a conversation with B.B.

because he does not want to talk. She asserted that she would do anything required of her in order to get him back. When she was told that B.B. did not want to see her at Wellspring, she did not complain because she did not feel like there was anything that she could do. When she later called Wellspring to see if there would be future visits, she was told that B.B. would probably not want to show up again.

Regarding her estrangement from her parents, Lacy testified that on one occasion when her parents and her aunt came to her home, she had to tell B.B. several times not to play on a cell phone but to spend time with his family. He was also hyperactive that day and she told him to calm down. He was around four years old at the time. Later that day, her father returned and told her that she was being too hard on B.B. After that, she ceased all contact with her parents since she thought they did not approve of the way that she was raising B.B. She already had a strained relationship with her father before that happened.

Joseph Cruse was a private investigator retained by the Wilsons. He began surveillance of Lacy and Casey on January 21, 2018. He followed them from Haughton, Louisiana to a casino shortly after Lacy was served with a protective order.

Terri Wilson lives in Downsville, Louisiana with her husband and B.B. Their home has three bedrooms and two bathrooms. B.B., who was in the third grade at Union Christian Academy at the time of trial, makes A's and B's in school. Terri testified that B.B. would act like a zombie and be tired all the time when his mother had custody of him. Now he is very bright and happy.

Terri recounted that following Joshua's death, Lacy told her that she would get to see B.B., but then changed her mind after the incident at the funeral. Therefore, Terri sought visitation on alternating weeks like the arrangement was prior to Joshua's death. She wanted stability for B.B's benefit.

Terri testified that she has encouraged a close relationship between B.B. and Lacy. Regarding the lack of visitation, she claimed that Wellspring cancelled it and told her it was a waste of everyone's time because of B.B.'s reluctance to see his mother.

Terri testified that B.B. has told her that he is afraid of his mother and Casey. She believed that B.B. would be in danger if he lived with Lacy and Casey. She did not think it was a safe place for B.B., who felt the same way.

Terri took the photos of B.B.'s injuries that were filed into evidence. She testified that B.B. told her how the marks shown in the photos occurred. He claimed that the bruises occurred when Casey whipped him after he hid his medications. She filed a complaint with the police after this. He told her that the other bruises on his buttocks were from his mother spanking him after he moved hay. Terri thought that happened in the summer. Terri acknowledged that she never asked Lacy about the bruises. Regarding the photo showing a mark on B.B.'s mouth, Terri testified that he told her that was caused by his mother spanking him and throwing him into a trash can after she accused him of hurting a cat.

Casey Brown testified that he thought he had a good relationship with B.B. He recalled that B.B. waited for him to return from work each day and met him with a hug. He never thought B.B. was scared of him. Casey

11

denied ever physically abusing B.B. He also stated that he had never seen Lacy abuse B.B. in any way.

Casey recalled that he popped B.B. on his buttocks with a wooden spoon after he caught B.B. stomping on a kitten in the house. He did not think he hit B.B. hard enough to bruise him. He also hit B.B. on his buttocks with his hand after B.B. had grabbed his newborn brother's head. Casey could not recall hitting B.B. a third time. Casey denied ever hitting B.B. on his bare buttocks.

Asked about the photos of the bruises, Casey stated that he did not know for certain what caused the bruises, but denied that they were caused by him. He explained that B.B. had fallen three times. The first time was when he fell down steps at a church while with Casey's sister. The second time was when he slipped exiting the truck and hit the ground. The last time was on Christmas Day when he tried to jump off the porch to play with a new toy outside and hit his buttocks on the side of the porch.

The trial judge conducted a *Watermeier* examination of B.B., who testified that he enjoys fishing, playing, and swimming with the Wilsons. From B.B.'s perspective, the Wilsons mostly let him do what he wants. He felt like Lacy asks him the same questions during their weekly phone conversations. B.B. wanted to be with the Wilsons.

When the trial judge asked B.B. how he got along with Casey when he lived with them, B.B. responded "not good" and that they hurt him all the time. Regarding his home life with Lacy and Casey, B.B. told the trial judge that: (i) he was not supposed to look outside his window; (ii) they put a camera in his room after he started taking medication; (iii) he was not

allowed in the kitchen unless it was to eat; (iv) he was mostly limited to the living room and his bedroom; (v) he had to ask for permission to play outside; (vi) he sometimes had to stay outside when he wanted to be inside; (vii) the medications that he took then made him feel weird; (viii) he had hidden his medications under a dresser; and (ix) his clothing was removed during a search for his medications.

When the trial judge asked if there was anything else that Lacy or Casey did to him that was mean, he answered that Lacy had picked him up and thrown him in the trash can because of how he was playing with a cat. He denied harming the cat. B.B. added that there was a lot more that Lacy and Casey did to him that was mean but he could not remember it. He stated that he told the Wilsons what Casey and Lacy had done to him.

B.B. testified that he does not want to see Lacy because he is scared of her and Casey since they hurt him all the time. He stated that Lacy spanked him a lot. One time she spanked him with a wooden spoon when he put hay under a trampoline. His pants were off when she spanked him, and she hit him three times. B.B. testified that was all he knew about the stuff that really hurt.

Regarding his discipline by the Wilsons, B.B. stated that they holler at him a little but never spank him. Lacy fussed at him a lot. She would not tell him that she was sorry if she hurt him.

B.B. testified that he is afraid of Casey because Casey also hurt him. He recalled that Casey had hit him four to five times with a belt. B.B. agreed that he did not like someone who was not his father spanking him. He does not like Casey being around because Casey hurt him and he does

13

not even know Casey. He claimed that after having been spanked by Casey already for something that he had done, Casey would spank him again right before he went to sleep.

B.B. testified that he received bruises when Casey spanked him. He also got a sore on his lip when Lacy threw him in the trash can.

### *Reasons for judgment*

The trial judge provided detailed reasons for judgment when he rendered his written ruling on October 18, 2021. The judge noted that the protective order entered on January 22, 2018, had been extended multiple times, and that with the exception of a few supervised visits, B.B. had not seen his mother since January of 2018.

The judge noted that: (i) Power never interviewed Lacy or Casey; (ii) Power reached her conclusion that B.B. was mentally abused based on his statements; (iii) Power reached her conclusion that B.B. was physically abused based on photos of his buttocks and face, and statements from B.B. and the Wilsons; (iv) Lacy and Casey denied any physical abuse but admitted to using corporal punishment to discipline B.B; and (v) they claimed the bruises in the photos were caused by accidents and not discipline.

The judge thought the Wilsons indulged B.B. and catered to him to the point of spoiling him. He noted that B.B. recalled being spanked for misbehaving and being thrown into a trash can. He also noted that while B.B. twice stated that Lacy or Casey hurt him all the time, B.B. was vague regarding any details.

14

The judge noted there were no allegations of substance abuse or use of illegal drugs by Lacy or Casey. There was no evidence of neglect. While the judge did not condone the fact the relationship between Lacy and Casey began as an adulterous affair and they remained unmarried despite having three children together, the court believed they had a stable relationship, were committed to their family, and planned to marry. The judge expressed significant concern that B.B. had no chance to develop any type of relationship with his half-siblings.

The judge recognized that the only allegations against Lacy were based on the photographs which arguably showed physical abuse and Lacy's failure to protect B.B. However, the judge found the photos to be inconclusive. While the photos were supposedly substantiated by B.B.'s complaints to the Wilsons and Power, that was negated by B.B.'s statements to the court. There was nothing else to show the threat of substantial harm if B.B. were in Lacy's custody.

The judge found that Power's testimony and particularly her written reports indicated a lack of objectivity that was troubling. The judge also found her testimony and reports less worthy of consideration because Power made no attempt to get Lacy's side of the story. The judge believed that Power's opinion was affected by her lack of knowledge concerning the Wilsons' receipt of social security benefits since 2018 and that Lacy had placed the workers' comp benefits in a savings account. Finally, the court noted that Power's assumption of physical abuse was based mostly on the criminal charges and the fact that a protective order was issued.

The judge thought B.B.'s claims that he was "hurt all the time" or that Lacy and Casey were "being mean to him" were possibly more an indication of their poor parenting skills than abuse. The court found no showing of substantial harm to B.B. if he were reunited with his mother.

The court ordered that the protective order was to be dissolved. Lacy and Casey were also ordered to attend court-approved parenting classes. After a transition period of one month, Lacy was to have custody of her son on alternating weeks. On February 7, 2022, the court would have a custody review hearing to determine how the transition had progressed. The court would then determine if it would be appropriate to award full custody of B.B. to his mother and return to a visitation plan similar to the one in the consent judgment of August 24, 2017. B.B. was to remain at his school.

The judge commented that the matter started out as a petition for visitation under La. R.S. 9:344 before it morphed into a full custody dispute even though the pleadings never actually reflected a claim under La. C.C. art. 133. Therefore, the goal of the court was to reunite B.B. with his mother and half-siblings and to provide the Wilsons with visitation rights.

A judgment in accord with the reasons for judgment was rendered on November 10, 2021. The Wilsons filed a motion to appeal the judgment on November 15, 2021.

On March 28, 2022, the trial court ordered Lacy to have Casey's name removed from BB's special savings account, and that Lacy's name be added to the account. An additional review hearing was set for June 16, 2022.

# DISCUSSION

The Wilsons argue on appeal that the trial court abused its discretion in granting the parties joint and shared custody of B.B. when the only expert who testified, Amanda Power, stated that he would suffer irreparable harm if sole custody were not granted to the Wilsons. The Wilsons also maintain that the trial court abused its discretion in granting joint and shared custody in light of La. C.C. arts. 133 and 134 and the specific facts of this case.

In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La. C.C. art. 131.

If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment. La. C.C. art. 133.

In determining the best interest of the child, the court shall consider all relevant factors, including:

> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
> (2) The love, affection, and other emotional ties between each party and the child.
> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
> (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
> (6) The permanence, as a family unit, of the existing or proposed custodial home or homes.
> (7) The moral fitness of each party, insofar as it affects the welfare of the child.

17

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

La. C.C. art. 134.

There is no requirement to provide an exhaustive listing of each of the factors of La. C.C. art. 134 in reaching a determination regarding the best interest of the child, nor is there a requirement to explain the weighing and balancing of the factors. *Smith v. Holloway*, 53,352 (La. App. 2 Cir. 1/15/20), 289 So. 3d 647.

Every child custody case must be viewed on its own particular set of facts and relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. *Fuller v. Fuller*, 54,098 (La. App. 2 Cir. 7/21/21), 324 So. 3d 1103, *writ denied*, 21-01223 (La. 9/27/21), 324 So. 3d 621.

A trial court's determination on matters of child custody and domestic abuse is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. *Green v. Myers*, 54,200 (La. App. 2 Cir. 3/9/22),

18

335 So. 3d 514, *writ denied*, 22-00737 (La. 5/18/22), 338 So. 3d 1188; *Richardson v. Smith*, 47,347 (La. App. 2 Cir. 5/16/12), 92 So. 3d 1145.

Under the unique facts and circumstances of this matter, we conclude that the trial court did not abuse its discretion in dissolving the protective order and implementing joint and shared custody with the goal of reuniting B.B. with his mother and providing the Wilsons with visitation rights.

The basis of the protective orders was the allegation that B.B. was being abused by Lacy and Casey. Casey was found not guilty of the criminal charge. In this custody matter, the judge considered B.B.'s complaints of being "hurt all the time" and Lacy and Casey "being mean to him" to possibly be indications of poor parenting skills but not necessarily abuse. The judge found no showing of substantial harm to B.B. should he be reunited with his mother.

There is no doubt that the Wilsons have been able to foster a nurturing environment for B.B. during the four years that he lived with them on a full-time basis. However, we also have no doubt that Lacy was frustrated in her attempts to have some sort of relationship with her son during this period when she was constrained by the protective orders. Again, the protective orders were issued on the basis of unfounded allegations of abuse.

Finally, we appreciate that the trial judge has added a layer of protection for B.B.'s best interest by wisely setting a series of custody review hearings with the goal of awarding full custody of B.B. to Lacy and a return to a visitation plan similar to the one consented to by the parties in August of 2017.

## CONCLUSION

For the foregoing reasons, we affirm the judgment at the Wilsons'
costs.

**AFFIRMED**.